MIDLAND ENTERPRISES, INC. et al., Appellees and Cross–Appellants,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Appellant
and Cross–Appellee; Alexander & Alexander of Ohio, Inc.*

[Cite as *Midland Ent., Inc. v. St. Paul Fire & Marine
Ins. Co.* (2000), 139 Ohio App.3d 650.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–990778.

Decided May 19, 2000.

---

* We have *sua sponte* removed this case from the accelerated calendar.

*Arnzen, Parry & Wentz* and *Ron Parry,* for appellees and cross–appellants.

*Porter, Wright, Morris & Arthur, John J. Cruze* and *Eric J. Plinke,* for appellant and cross–appellee.

PAINTER, Judge.

The 1992 sinking of a historic dredge boat precipitated this case. A jury found that the insurer, St. Paul Fire & Marine Insurance Company, was obligated to provide liability coverage to Midland Enterprises Inc., the company that towed the dredge and had been sued by the dredge's owners for allegedly causing the dredge to sink. We believe the jury was correct, and affirm.

## I. Midland Volunteers to Tow Sainte Genevieve

Midland Enterprises, Inc., through its affiliated companies, which include The Ohio River Company, Inc. (collectively, "Midland"), provides towing services on the inland river systems in the United States. As part of the Cincinnati Tall Stacks 1992 event, the Greater Cincinnati Tall Stacks Commission asked Midland to volunteer its services to tow a historic dredge boat named the Sainte Genevieve to the Cincinnati area. When Midland said that it would do the towing on the condition that the commission provide it with insurance coverage in case anything happened while the dredge was in transit, the commission referred Midland to an insurance broker, Alexander & Alexander of Ohio, Inc.

In May 1992, Lester Berger, Midland's director of risk and insurance, corresponded with Jennifer Bell, a representative of Alexander & Alexander, about insurance. One type of coverage that Berger requested was tower's liability coverage to insure Midland against liability for negligence during the towing of the Sainte Genevieve. Sometime between June and August, Midland became aware that Bell had selected St. Paul Fire & Marine Insurance Co. to provide its insurance.

On August 31, St. Paul issued a "Binder of Insurance" to Midland. The binder named the commission as the primary insured and Midland and the owners of the Sainte Genevieve as additional assureds. Regarding the Sainte Genevieve, the

binder referred to two types of coverage: (1) Hull and Machinery coverage, and (2) Protection and Indemnity ("P&I") coverage. For the Hull and Machinery coverage, the binder listed the value of the Sainte Genevieve as $250,000. Under the P&I section, the binder stated that there would be one million dollars in coverage. The binder did not specify any of Midland's vessels as being scheduled for tower's liability coverage.

On September 25, Bell issued a "Certificate of Insurance" to Midland. The certificate stated, among other things, that St. Paul was to provide P&I coverage of one million dollars per occurrence. Under the "Comments" section, the certificate further stated, "As respects the towing of the Sainte Genevieve Dredge from Grafton, Illinois to Newport, Ky. for Tall Stacks '92, it is hereby understood and agreed that The Ohio River Co., Midland Enterprises Inc., and its affiliated companies are named as additional [assureds] and the insurance companies waive their rights of subrogation against said named assureds."

On October 1, the Sainte Genevieve sank while being towed by a Midland vessel to the Tall Stacks event. A few weeks later, St. Paul issued the formal insurance policy that covered the sinking.

St. Paul paid $250,000 to the Sainte Genevieve's owners. Later, the owners sued Midland for more money. The owners claimed that Midland had caused the Sainte Genevieve to sink. Midland asked St. Paul to provide a defense, but St. Paul stated that it had no duty to defend or to provide coverage. Ultimately, Midland settled the suit, at a cost to Midland of $147,007.17 in litigation and settlement expenses.

Midland then sued St. Paul, claiming that St. Paul had improperly refused to defend or provide coverage. (Midland also sued Alexander & Alexander. That case was settled, and Alexander & Alexander is not involved in this appeal.) The case went to trial, and the jury decided that St. Paul should have provided coverage. The jury awarded $147,007.17, plus interest and costs, to Midland.

St. Paul now appeals, asserting five assignments of error. Midland has filed a cross-appeal. We address the cross-appeal first.

## II. Summary Judgment

Midland asserts in its cross-appeal that the trial court erred in denying a motion for summary judgment that it filed before trial. In that motion, Midland argued that the certificate of insurance that was issued on September 25 obligated St. Paul, as a matter of law, to provide tower's liability coverage for the sinking of the Sainte Genevieve. A summary-judgment motion is appropriately granted if the court, viewing the evidence in the light most favorable to the nonmoving party, determines that no genuine issue of material fact remains to be

litigated, and that the evidence demonstrates that reasonable minds can come only to a conclusion that is adverse to the party opposing the motion.[1]

Midland focused on the plain language of the certificate. Midland pointed to the certificate's reference to one million dollars in P & I coverage and to the comment that coverage was for the "towing of the Sainte Genevieve." According to Midland, that language showed St. Paul's intent to provide tower's liability coverage. On the other hand, St. Paul focused on the binder of insurance that was issued on August 31. St. Paul claimed that tower's liability coverage was not provided in the binder. St. Paul explained that, under the language of the policy forms used in the binder, Midland was to get only tower's liability coverage for its vessels that were listed, or scheduled, in the binder. St. Paul pointed out that Midland never gave it a list of scheduled vessels. Thus, St. Paul argued that it was not obligated to pay anything over the $250,000 that it had already paid to the owners of the Sainte Genevieve.

The basic point of dispute is whether St. Paul had agreed to provide tower's liability coverage for the sinking of the Sainte Genevieve. According to St. Paul, the binder of insurance showed that this coverage was not intended. According to Midland, the certificate of insurance showed that there was coverage.

The case is unique because, unlike most insurance-coverage disputes, the terms of the formal policy of insurance are not at issue—the formal policy was issued *after* the Saint Genevieve sank. It would not be appropriate to look to the terms of a policy that was not issued when the alleged triggering event for coverage, the sinking of the Sainte Genevieve, occurred. Thus, the parties correctly focus on the binder and the certificate, both of which were issued before the Sainte Genevieve sank.

 Legally, a binder of insurance serves a different purpose than a certificate of insurance. A binder is a temporary policy of insurance that is effective until the issuance of a formal policy.[2] A certificate is not a policy itself, but it serves as evidence of coverage.[3] In cases such as this, where the binder and the certificate present competing suggestions as to whether certain coverage is provided, and where the formal insurance policy was not in effect when the triggering event for coverage occurred, we cannot look at either the binder or the

---

1. See Civ.R. 56(C).

2. See *Clements v. Ohio State Life Ins. Co.* (1986), 33 Ohio App.3d 80, 85, 514 N.E.2d 876, 882; Couch on Insurance 3d (1996) 13–2, Section 13:1; 43 American Jurisprudence 2d (1982) 304, Insurance, Section 219.

3. See *Talley v. Teamsters, Chauffeurs, Warehousemen, & Helpers, Local No. 377* (1976), 48 Ohio St.2d 142, 144, 2 O.O.3d 297, 298–299, 357 N.E.2d 44, 46; 45 Corpus Juris Secundum (1993) 102–103, Insurance, Section 379.

certificate in isolation. Contrary to an argument by St. Paul, the certificate did not merely serve to certify the coverage provided by the binder. And, contrary to an argument by Midland, the certificate did not take precedence over the binder because the certificate was issued after the binder. We must look at both the binder and the certificate together to determine whether St. Paul intended to provide coverage—an objective inquiry.

■ Looking at both the binder and the certificate, we conclude that the competing interpretations offered by St. Paul and Midland regarding these documents are both reasonable. In light of the competing interpretations, we conclude that the trial court did not err in denying Midland's summary-judgment motion. A genuine issue of material fact existed regarding St. Paul's intent to provide tower's liability coverage, and the issue was properly sent to a jury.[4] Midland's cross-appeal is not well taken.

III. Motions for Directed Verdict and Judgment Notwithstanding the Verdict

■ Turning to St. Paul's appeal, St. Paul asserts in its first and second assignments, respectively, that the trial court erred in denying a motion for judgment notwithstanding the verdict and a motion for directed verdict that it filed with the court. We treat the assignments together because the standard for reviewing a motion for JNOV is the same as the standard for reviewing a motion for directed verdict. In both, the court, without weighing the evidence, must construe the evidence most strongly in favor of the nonmovant, and determine whether reasonable minds can conclude only in favor of the movant. If the evidence admits of only one conclusion, the motion is properly granted.[5]

■ St. Paul argues that the record contains no evidence that it agreed to provide tower's liability coverage for the sinking of the Sainte Genevieve. St. Paul points out that Midland's correspondence regarding insurance coverage was with Jennifer Bell, a representative of Alexander & Alexander. St. Paul asserts that Bell was not an agent of St. Paul when Midland requested tower's liability coverage. Because Bell was not an agent for St. Paul when the request was made, St. Paul argues that there is no evidence that it agreed to provide tower's liability coverage, and, thus, that no contract for tower's liability coverage was formed.

---

4. See *Wilmington Carpets, Inc. v. McGuire* (Feb. 20, 1996), Clinton App. No. CA95–09–022, unreported, 1996 WL 71491 ("Questions of contract formation and intent are generally factual issues to be resolved by the trier of fact after a review of the evidence."); *Wells v. Am. Elec. Power Co.* (1988), 48 Ohio App.3d 95, 97, 548 N.E.2d 995, 997.

5. See Civ.R. 50; *Universal Windows & Doors, Inc. v. Eagle Window & Door, Inc.* (1996), 116 Ohio App.3d 692, 699, 689 N.E.2d 56, 60.

■ An insurance broker becomes an agent for a particular insurer when "(1) the broker notifies its customer, the potential insured, that he or she intends to place the customer's insurance coverage with a particular insurer; or (2) the broker accepts an application for insurance on behalf of the customer."[6] Here, the record reveals that, between July and August 1992, Midland became aware that Bell had selected St. Paul to provide its insurance coverage. Thus, a jury could have concluded that Bell became an agent for St. Paul between July and August. This means that, although Bell may not have been an agent for St. Paul when Midland originally requested tower's liability coverage in May 1992, a jury could have concluded that she was an agent for St. Paul when the certificate of insurance was issued on September 25. Also, a jury could have concluded that Bell was an agent for St. Paul when the certificate was issued based on the trial testimony of a representative of St. Paul, who stated that Bell had the authority to issue the certificate on behalf of St. Paul.

■ If Bell was considered an agent for St. Paul when the certificate was issued, the issue then becomes this: Could a reasonable juror have concluded based on the certificate that St. Paul had agreed to provide the tower's liability coverage that Midland had requested when it originally spoke to Bell? We conclude that the certificate was proper evidence of such coverage. The certificate refers to a million dollars in P & I coverage and states in plain language that coverage was "for the towing of the Sainte Genevieve." The language of the certificate does not state that there were any limitations for that coverage. Further, we note that a Midland employee, Daniel Ricciardi, testified at trial that Bell had stated to him after the sinking of the Sainte Genevieve, "[D]on't worry, it's a good thing we have insurance coverage. We shouldn't be liable for anything." Ricciardi also testified that an underwriter for St. Paul had indicated to him after the sinking that Midland would be covered. With that testimony, and viewing the language of the certificate in the light most favorable to Midland, a reasonable juror could have concluded that Bell had communicated Midland's request for tower's liability coverage to St. Paul and that St. Paul had agreed to provide it. We reject St. Paul's first and second assignments.

### IV. Weight of the Evidence

In its third assignment, St. Paul asserts that the trial court erred in denying a motion for a new trial. St. Paul argues that a new trial should have been granted on the ground that the judgment was against the weight of the evidence.[7] We combine the third assignment with St. Paul's fifth assignment, which also asserts

---

6. See *Damon's Missouri, Inc. v. Davis* (1992), 63 Ohio St.3d 605, 590 N.E.2d 254, syllabus.

7. See Civ.R. 59(A)(6).

that the judgment was against the weight of the evidence. In light of the evidence discussed above, we conclude that there was competent, credible evidence in support of the jury's decision. We reject the third and fifth assignments.

## V. Jury Instructions

██ Finally, in its fourth assignment, St. Paul contends that the trial court erred in denying a jury instruction that it had proposed. The proposed instruction would have instructed the jury that it could find that Bell was the agent of Lester Berger, Midland's director of risk and insurance, when Bell issued the certificate of insurance:

"Jennifer Bell was the agent of Lester Berger if:

"[1] Lester Berger possessed the right to control the actions of Jennifer Bell;

"[2] Lester Berger exercised the right to control the actions of Jennifer Bell; and

"[3] The actions of Jennifer Bell were directed to the attainment of an objective which Lester Berger sought.

" * * *

"If you find [that] Jennifer Bell was the agent of Lester Berger for purposes of preparing the Certificate of Insurance, you may not consider the Certificate of Insurance as evidence of the contractual intent of St. Paul Fire and Marine Insurance Company."

██ In reviewing a proposed jury instruction, an appellate court must consider the jury charge actually given as a whole. It is within the sound discretion of the trial court to refuse to use proposed instructions that are either redundant or immaterial to the case.[8] Here, the instructions actually given by the trial court specified that a key issue to be determined was whether Bell was an agent for St. Paul when the certificate of insurance was issued. The court later defined agency and discussed the difference between express authority and implied authority. The court explained when a principal can be liable for an agent's actions. The court also explained when an agent's actions are outside the scope of his or her authority: "An agent's actions are not within the scope of her authority and [are] not binding on her principal when [they are] contrary to or [go] beyond the principal's express authority, [they are] not reasonably necessary in order to do the agent's job, or [they are] performed solely for the benefit of the agent or some other person."

---

8. *Aerosol Sys., Inc. v. Wells Fargo Alarm Serv.* (1998), 127 Ohio App.3d 486, 492–493, 713 N.E.2d 441, 445.

We conclude that the instructions given by the court were more than adequate to make the jury aware that the issue of Bell's agency with St. Paul was a key determination that needed to be made. The jury was thoroughly instructed on how it could find that Bell was, or was not, an agent when the certificate of insurance was issued. In light of these thorough instructions, we conclude that St. Paul's proposed instruction was not necessary. The court did not err in not using it. We overrule St. Paul's fourth assignment.

Therefore, the judgment of the trial court is affirmed.

*Judgment affirmed.*

HILDEBRANDT, P.J., and WINKLER, J., concur.